# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M4 Holdings, LLC, a New Jersey     :
limited liability company and     :
Boulderview Properties, LLC, a     :
Pennsylvania limited liability company     :
    :
          v.     :    No. 902 C.D. 2019
    :
Lake Harmony Estates Property     :
Owners' Association, a Pennsylvania     :
non-profit corporation,     :
               Appellant     :


M4 Holdings, LLC, a New Jersey     :
limited liability company and     :
Ledgestone Properties, LLC, a     :
Pennsylvania limited liability company     :
    :
          v.     :    No. 1197 C.D. 2019
    :
Lake Harmony Estates Property     :
Owners' Association, a Pennsylvania     :
non-profit corporation,     :
               Appellant     :


M4 Holdings, LLC, a New Jersey     :
limited liability company and     :
Boulderview Properties, LLC, a     :
Pennsylvania limited liability company     :
    :
          v.     :    No. 1424 C.D. 2019
    :    Argued:  May 11, 2020
Lake Harmony Estates Property     :
Owners' Association, a Pennsylvania     :
non-profit corporation     :
    :
Appeal of:  M4 Holdings, LLC,     :
Boulderview Properties, LLC, and     :
Ledgestone Properties, LLC     :

OPINION BY
JUDGE COHN JUBELIRER                    FILED: August 14, 2020

Presently before this Court is Lake Harmony Estates Property Owners' Association's (Association) interlocutory appeal from the June 24, 2019 Amended Order of the Court of Common Pleas of Carbon County (common pleas) finding in favor of M4 Holdings, LLC (M4 Holdings) on all counts of its declaratory judgment actions. At issue in this case is whether a rule limiting the size of new construction in Lake Harmony Estates was validly adopted by the Association's Board of Directors (Board) at a purported meeting conducted through a series of email correspondence exchanged between the members of the Board over a period of two days. On appeal, the Association argues it validly adopted the rule. Alternatively, the Association contends that even if it did not validly adopt the rule, it subsequently ratified the rule. Also before this Court is a Notice of Cross Appeal filed by M4 Holdings, Ledgestone Properties, LLC (Ledgestone Properties), and Boulderview Properties, LLC (Boulderview Properties) (collectively, Developers). For the reasons that follow, we affirm common pleas' Amended Order finding in favor of M4 Holdings and dismiss Developers' Notice of Cross Appeal as moot.

## I.    Factual Background

This case arises out of the Board's efforts to regulate new construction in Lake Harmony Estates, a planned community in Kidder Township, Carbon County. The salient facts are not in dispute. The Association is a not-for-profit corporation incorporated under the Nonprofit Corporation Law of 1988 (NPCL), 15 Pa.C.S. §§

5101-5997, and its Board is charged with managing the business of the Association. (Bylaws, Section IV, Article VII, ¶ 1, Reproduced Record (R.R.) at 1243a.) On April 10 and 11, 2013, the members of the Board exchanged a series of email correspondence in which board members discussed whether to exercise a right of first refusal (ROFR) related to the properties at issue and the adoption of a rule limiting construction of new residences to homes no larger than 2,500 square feet, with no more than 5 bedrooms and 3 bathrooms (2,500 Square Foot Rule). (Revised Decision, Findings of Fact (FOF) ¶¶ 15-16; R.R. 792a-834a.) Specifically, on April 10, 2013, at approximately 12:29 p.m., Larry Gould, vice-president of the Board at that time, sent the following email to the other six members with the subject line "Re: R[OF]R":

> Let it be confirmed that the first clock date and time that this has been presented to the Board . . . today Wednesday April 10TH 2013 [sic], at 11:23 AM . . . . As per our existing [Bylaws] . . . Lake Harmony Estates, its successors and assigns, which shall have the right within 30 days of receipt of such [] written notice of purchasing said premises at the price and the same terms offered by such party. As such, the Board . . . ha[s] 30 days to act on our [ROFR] starting from the exact clock date and time indicated therein. This ROFR is for 2 lots, 2 adjacent lots on Skye Drive. The purchaser is M4 Holdings . . . . It is readily apparent that [M4 Holdings] will be desiring to build 2 large commercial rentals on these lots. We have been talking about placing controls on such buildings for five months now; five months! In light of this fact, I propose an[] amendment to our existing [Bylaws], effective immediately, which limits the size of all new construction, to 5 bedrooms, 3 bathrooms, and no larger than 2500 square feet. This is a fair and equitable approach, as the Township has a 10[-]person maximum occupancy rule, and our own [Bylaws] indicate that a reasonable rule of thumb in regards to occupancy shall be 2 persons per bedroom, hence, a 5[-]bedroom maximum. 3 bathrooms are more than enough to serve that size structure, and limits water consumption with our water conservation policy. 2500 square feet is between the basic large home (2000 square feet), and a larger one (3000 [s]quare feet). This is all in line with the Township's ideals and fits well into the

3

general philosophy of the Estates, and covers us from an ecological "footprint" standpoint, as well as many other factors. Furthermore, it does not discriminate against any one type of home.

We need to vote YES on this right now, effective immediately.

(R.R. at 798a (quotation marks omitted).)

Over the course of the next roughly 22 hours, 5 members of the Board exchanged a series of email correspondence. (*Id.* at 796a-99a.) Common pleas summarized their response with regard to the 2,500 Square Foot Rule, in relevant part, as follows:

> Jessie Smiley – Seconded Mr. Gould's "motion" on two occasions; did not render a subsequent "vote."[1]
>
> John Con[a]way – Indicated support for the 2,500 Square Foot Rule proposal.[2]

---

[1] Smiley sent an email on April 10, 2013, at 4:02 p.m., stating:

> I assume that [Gould] just made a motion to limit new construction to 5 bedrooms, 3 bathrooms, and no larger than 2500 square feet. . . . I second [Gould]'s approach and encourage others to do the same. . . . We need to protect the community from more R[OF]R[]s like this one here from M4 Holdings. I would encourage all [B]oard members to NOT sign off on this R[OF]R for lots 713 and 714.

(R.R. at 797a-98a.) Gould responded to this email at 4:42 p.m. the same day asking "[w]ould all Board members please vote on the motion and second to limit [the] size of all new construction effective immediately." (*Id.* at 797a.)

[2] Conaway sent an email on April 10, 2013, at 6:25 p.m., stating he "support[s] exercising our ROFR for lots 713 and 714 on Skye Drive" but

> [a]s far as for updating our [Bylaws] regarding building sizes, I thought we had already been advised that this approach would not be enforceable. Unless I am somehow mistaken, I cannot support this course of action that is likely to attract litigation similar to the complaint that was recently resolved. We have already established that our best and only protection against these large commercial rental

**(Footnote continued on next page…)**

Russell Ferretti – Indicated support for the 2,500 Square Foot Rule proposal.[3]

Kellie Melba – Indicated support for the 2,500 Square Foot Rule proposal.[4]

---

properties is to update our [B]ylaws and to aggressively enforce our existing rules regarding behavioral problems associated with these properties.

In my opinion, the efforts taken by some members of the previous [B]oard to push back against these properties was heroic. To pick another fight now, however, knowing what we now know, and on these heels of a recent settlement, would be something else. I am as anxious as anyone to solve this problem, but we have a plan and we should stick with it.

That being said, I would gladly reconsider my position if my initial premise is inaccurate.

(R.R. at 797a.) After other members sent reply emails, and after receiving email correspondence from the Board's attorney, Conaway sent a second email on April 11, 2013, at 7:09 a.m., stating "Ok [Gould]. Good job. You have my support for amending the [Bylaws] along the lines being proposed." (*Id.* at 796a.)

[3] Ferretti sent an email on April 11, 2013, at 7:38 a.m., stating:

I also agree to amending our [Bylaws] to place limitations on the number of bedrooms, bathrooms and square footage of new construction. [Gould] and I discussed this by phone last night. [The Board's attorney's] advice on this matter provides us with the legal evaluation to know we are on firm ground with this new rule. I also concur with exercising our ROFR rights to purchase 713 & 714 Skye Drive for one dollar. Clearly, the owner is not likely to sell to us for this price and the purchase agreement with M4 [Holdings] will be re-worded and resubmitted to us at a later time. . . .

(R.R. at 796a.)

[4] Melba sent an email on April 10, 2013, at 10:28 p.m., stating:

The more I think about this, the more upset I get. I truly believe that we need to get our [B]ylaws updated ASAP. Maybe if [the Board's attorney] can't[,] we [can] find someone who can. It was my understanding that we had to have new [B]ylaws presented at a semi-annual meeting. Maybe we need to push our semi-annual

**(Footnote continued on next page…)**

Bob Haeseker – Indicated conditional support for the 2,500 Square Foot Rule proposal.[5]

(Memorandum Opinion (Op.) at 5-6 (emphasis omitted).) Common pleas found that one member of the Board, Barry Scholtz, "did not participate in the" series of email correspondence at issue.[6] (*Id.* at 6.) The Board purports to have adopted the 2,500 Square Foot Rule proposal as an amendment to the Bylaws in the series of email correspondence exchanged on April 10 and 11, 2013, by a majority vote. (Revised Decision, FOF ¶ 15.) On May 2, 2013, the Board issued a notice to the members of the Association that it had "approved" the following addition to the Bylaws: "new construction homes or new construction residences shall be limited to [5] bedrooms and [3] bathrooms, and a maximum of 2,500 square feet." (Revised Decision, FOF ¶ 16, 20; R.R. at 781a.)

---

meeting back to June (as long as its [sic] still spring) and we could have something ready to present to the membership then?

(R.R. at 797a.)

[5] Haeseker sent an email on April 11, 2013, at 11:22 a.m., stating:

[I] approve [Gould's] suggestion to buy the property [at] 713 and 714 at the sale price of 1.00 per lot if that is the selling price under the [ROFR]. I also agree if it is legal to limit the size of the homes and the number of rooms and bathrooms if it corresponds with the recent court case decisions.

(R.R. at 792a.)

[6] In its brief, the Association disputes common pleas' finding that Scholtz did not participate in the series of email correspondence at issue, citing an attachment to its Summary Judgment Motion. The Association contends that Scholtz "issue[d] an e[]mail response on April 11, 2013 at 3:48 p.m. stating that the [2,500] Square Foot Rule '[s]eems like a practical and easy fix.'" (Association's Brief at 25.) Scholtz's response, the Association argues, "suggests that [] Scholtz was in favor of the [2,500] Square Foot Rule, but since his statement was not entirely clear, the Board viewed [] Scholtz as having abstained from the vote." (*Id.*) To the extent Scholtz may have issued an email response, common pleas not seeing that response was harmless error and, for the reasons that follow, not outcome determinative to this case.

6

On April 23, 2013, M4 Holdings closed on the purchase of 713 and 714 Skye Drive, two lots located within Lake Harmony Estates. (Revised Decision, FOF ¶ 9; R.R. at 1142a-43a.) On June 18, 2013, M4 Holdings submitted a building application to the Board seeking approval to construct a 3,715-square-foot residence, consisting of 6 bedrooms and 5 bathrooms, at 713 Skye Drive.[7] (Revised Decision, FOF ¶¶ 21-22; R.R. at 982a-85a.) The Board denied this application, stating, in relevant part, that the proposed residence "failed to conform to the [A]ssociation's [Bylaws] regarding square footage, number of bedrooms[,] and number of bathrooms." (Revised Decision, FOF ¶ 24; R.R. at 1021a-22a.)

On September 9, 2013, M4 Holdings submitted an additional building application to the Board with respect to 714 Skye Drive. (Revised Decision, FOF ¶ 25; R.R. at 991a-97a.) This application proposed to construct a 4,494-square-foot residence consisting of 7 bedrooms and 4 bathrooms. (*Id.*) The Board denied this application as well, again stating, in relevant part, that the proposed residence violated the 2,500 Square Foot Rule. (Revised Decision, FOF ¶ 26; R.R. at 1026a-27a.)

After the Board denied M4 Holdings' building applications with respect to 713 and 714 Skye Drive, M4 Holdings conveyed a one-half interest in 713 Skye Drive to Ledgestone Properties and a one-half interest in 714 Skye Drive to Boulderview Properties. (Revised Decision ¶ 28; R.R. at 1162a-66a, 1169a-73a.) Thereafter, on March 5, 2014, M4 Holdings submitted supplemental information to the Board, therein addressing the other reasons for the Board's denial of the above

_____

[7] Pursuant to Section VII of the Bylaws, owners must seek approval from the Association before commencing construction of new residences in Lake Harmony Estates. (Bylaws, Section VII, R.R. at 1265a.)

building applications, upon which the Board did not act. (Revised Decision, FOF ¶ 29; R.R. at 1034a-35a.)

Sometime before January 2015, a new Board was elected to govern the Association. (Revised Decision, FOF ¶ 31.) On February 21, 2015, the Board voted upon and unanimously approved a resolution **rescinding** the 2,500 Square Foot Rule. (*Id.*, FOF ¶ 32; R.R. at 1083a.) As a result, the Board issued permits dated January 6, 2015, which were not received by M4 Holdings until March 2015, allowing M4 Holdings to construct the previously proposed residences at 713 and 714 Skye Drive.[8] (Revised Decision, FOF ¶ 32; R.R. at 1060a, 1069a-70a.) Since receiving the building permits, M4 Holdings has constructed a residence at 713 Skye Drive. (Revised Decision, FOF ¶ 33.) However, as of October 31, 2017, no residence has been built at 714 Skye Drive. (*Id. ¶* 34.)

## II. Proceedings before Common Pleas

On January 24, 2014, after the Board denied M4 Holdings' building applications with respect to 713 and 714 Skye Drive, but before those applications were ultimately approved in 2015, M4 Holdings and Boulderview Properties initiated a declaratory judgment action against the Association challenging the denial of M4 Holdings' building applications with respect to 714 Skye Drive. Relevant to this appeal, M4 Holdings and Boulderview Properties' Complaint challenged the enforceability of the 2,500 Square Foot Rule. In addition to seeking an order declaring that M4 Holdings and Boulderview Properties were permitted to build the

---

[8] Before the Board voted to officially rescind the 2,500 Square Foot Rule in March 2015, it appears the Board granted permission, via email, to M4 Holdings to construct the proposed residences at 713 and 714 Skye Drive in January 2015. (R.R. at 1060a.) However, as stated above, M4 Holdings did not receive the actual building permits until March 2015.

proposed residence at 714 Skye Drive, the Complaint also sought monetary damages for the losses suffered as a result of the delay of construction due to the Board's denial of the building application. A similar suit was initiated by M4 Holdings and Ledgestone Properties on January 31, 2014, with respect to 713 Skye Drive.

After consolidating the two declaratory judgment actions and bifurcating the issue of damages, which would only need to be heard if there was a finding of liability, common pleas held a three-day bench trial, following which common pleas initially issued a Decision and Verdict (Initial Decision), finding in favor of the Association on all counts of the declaratory judgment actions. As to the issue of the 2,500 Square Foot Rule, common pleas concluded the 2,500 Square Foot Rule was validly adopted and that the Bylaws permitted the Board to conduct meetings and vote by email. Common pleas also found that Ledgestone Properties and Boulderview Properties acquired their one-half interests in 713 and 714 Skye Drive, respectively, after "the submission of the building applications," and, therefore, neither had "standing to contest the actions of [the Board] that occurred before their ownership interests matured." (Initial Decision, Conclusions of Law (COL) ¶ 27.)

Following the issuance of the Initial Decision, Developers filed a Motion for Post-Trial Relief, arguing, in relevant part, that common pleas "erred when it found that the [Board was] permitted to enact a rule change by an email string" and, therefore, common pleas also erred "when it found that the 2,500 [S]quare [F]oot [R]ule was adopted" by the Board. (R.R. at 1385a.) After holding argument on Developers' Motion for Post-Trial Relief, common pleas issued a Revised Decision, which was dated June 7, 2019, but was filed on June 10, 2019, in which it reversed its initial findings in favor of the Association, and instead found in favor of M4

9

Holdings.[9]  In doing so, common pleas held that the "2,500 Square Foot Rule had no valid force and effect at any time relevant to this matter" because the Board "did not validly adopt the 2,500 Square Foot Rule."  (Revised Decision, COL ¶¶ 20-23.) Common pleas explained its reasoning in a Memorandum Opinion wherein it addressed whether the series of email correspondence at issue "constitute[d] a Board . . . meeting and whether the communications delineated in said email correspondence comprise[d] validly constituted action of the Board . . . ." (Memorandum Op. at 2.)  In determining whether the series of email correspondence at issue constituted a meeting of the Board, common pleas first examined the plain language definitions of the terms "meeting" and "quorum," noting that neither term is defined in the NPCL or the Bylaws.  Based upon the plain language definitions of the terms, common pleas determined that

> [i]nherent and symbiotic [], in the concepts of "meeting" and "quorum," stands the requirement that individuals be together at the same place at the same time.  This applies with equal force even if the "place" is cyberspace.  Neither a "meeting" nor a "quorum" can be said to exist in the absence of the simultaneous continuous presence and assembly of the individuals claimed to be participating in the "meeting" or claimed to be constituting the "quorum" with respect to the "meeting."

(*Id.* at 11.)

Common pleas then turned to the relevant sections of the NPCL and the Bylaws.  Common pleas first examined Section 5708 of the NPCL, which provides that members of a board may meet "by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other."  *Former* 15 Pa.C.S. § 5708.  Common pleas then

---

[9] Common pleas maintained its findings from its Initial Decision that neither Ledgestone Properties nor Boulderview Properties had standing to challenge the Board's denial of the building applications for 713 and 714 Skye Drive.  (Revised Decision, COL ¶ 27.)

10

examined Section IV, Article XX, Paragraph 1 of the Bylaws, which provides that members of the Board "may participate in a meeting of the Board . . . via conference telephone or similar on-line communications equipment or other technology that enables all Board members to participate in the meeting." (Bylaws, Section IV, Article XX, ¶ 1, R.R. at 1251a.) Common pleas observed that the Bylaws deviate from the NPCL by replacing the requirement that board members be able to hear each other in meetings held via electronic technology with the requirement that the electronic technology used to conduct meetings of the Board must allow the members of the Board to participate in the meeting. Common pleas found this deviation permissible under the NPCL.

> Upon its review of the NPCL and the Bylaws, common pleas
>
> accept[ed] the conceptual propriety of meetings of incorporators, board of directors, or an[]other body of a Pennsylvania nonprofit corporation held via a series of electronic transmissions, including but not limited to meetings held via electronic mail, so long as[:] (1) such meetings have formal safeguards that ensure a definitive meeting start time[;] (2) the concepts of "meetings" and "quorum" stand maintained by the confirmation of simultaneous continuous presence and assembly of putative meeting attendees sufficient to establish and maintain a quorum throughout[;] (3) that technology employed permits meeting attendees to read, see, hear, or otherwise meaningfully participate in the proceedings substantially concurrently with the occurrence thereof[;] (4) formal safeguards exist that ensure a definitive meeting end time[;] and (5) corporate formalities remain maintained.[]

(Memorandum Op. at 15 (emphasis and footnote omitted).) However, common pleas found the above five safeguards were not present in this case, concluding that

> no party to this matter presented evidence that members of the Board maintained a simultaneous continuous presence and assembly sufficient to maintain a quorum throughout the [e]mail [c]ommunication [s]tring. The [c]ourt accordingly finds that the [e]mail [c]ommunication [s]tring did not constitute a meeting and that

11

the Board did not adopt the 2,500 Square Foot Rule. While technological advances may facilitate participation in a Board or other corporate meeting, a "meeting" must exist in which to participate and a "quorum" must exist throughout the "meeting."

(*Id.* at 16.)

Common pleas also found that the purported meeting of the Board on April 10 and 11, 2013, lacked corporate formalities. After examining decisions of courts in other jurisdictions, common pleas determined that

corporate meeting[s] require[] not only (1) that those directors assembled together be in the same place at the same time – even if cyber space provides the meeting place – but also (2) that sufficient compliance with corporate formalities exist so as to ensure that the assembly of directors does not constitute a mere ad hoc gathering.

(*Id.* at 17-18.) With respect to this case, common pleas found that there was no advance notice of the purported meeting held on April 10 and 11, 2013. Common pleas also found that the series of email correspondence at issue does not demonstrate that a majority of the members voted in favor of adopting the 2,500 Square Foot Rule. Specifically, common pleas found that only three members of the Board, Conaway, Ferretti, and Melba, affirmatively voted in favor of adopting the 2,500 Square Foot Rule. Additionally, common pleas found the series of email correspondence at issue did not represent a written agreement approving the 2,500 Square Foot Rule. Accordingly, common pleas held that the series of email correspondence at issue was not a meeting of the Board and, therefore, any action purportedly taken as a result of the email correspondence is not a valid action of the Board.

Following common pleas' issuance of the Revised Decision, the Association filed a "Motion for Post-Trial Relief and/or Reconsideration, or in the Alternative,

to Amend Order Permitting the Filing of an Interlocutory Appeal," therein challenging the conclusions reached by common pleas in its Revised Decision. On June 24, 2019, common pleas granted the Association's Motion for Post-Trial Relief insofar as the court agreed to certify the case for interlocutory appeal by permission but denied the motion in all other respects. Contemporaneously, on June 24, 2019, common pleas entered the Amended Order amending the Revised Decision, therein stating that it was "of the opinion" that this case "involve[d] a controlling question of law as to which there is substantial ground for difference of opinion to exist . . . and that an immediate appeal . . . may materially advance the ultimate termination and determination of the matter." (Common pleas' June 24, 2019 Amended Order.)

On July 18, 2019, the Association filed two separate Petitions for Permission to File Interlocutory Appeals with this Court for each of the declaratory judgment actions. By Orders dated September 27, 2019, we granted the Association's Petitions.[10] On October 7, 2019, Developers filed a Notice of Cross Appeal. We consolidated the interlocutory appeals by Order dated October 8, 2019. Following our consolidation, the Association filed an Application to Quash Developers' Notice of Cross Appeal on October 16, 2019, challenging the timeliness of the cross appeal.

---

[10] In our September 27, 2019 Order, we stated that we would consider the following three issues on appeal:

> 1. Whether the series of e[]mail correspondence among members of the Board . . . constitutes a Board meeting.

> 2. Whether the series of e[]mail correspondence among members of the Board constitutes a quorum.

> 3. Whether the series of e[]mail correspondence among members of the Board comprises validly constituted action of the Board.

(Pa. Cmwlth., September 27, 2019 Order.)

13

Developers filed an Answer to the Association's Application to Quash, therein stating that it "filed the Notice of Cross Appeal to preserve the remaining issues for [] review."[11] (Answer ¶ 9.) After holding argument on the Association's Motion to Quash, we consolidated the Notice of Cross Appeal with the interlocutory appeals and ordered the parties to address the Association's Application to Quash in their principal briefs.

**III. Discussion**

In reviewing this matter, we must be mindful that a not-for-profit corporation's authority

> to take corporate action must be construed in the least restrictive way possible, limiting the amount of court interference and second-guessing, which is reflective of both modern for-profit and not-for-profit corporations, and the modern corporate business laws that govern them. Thus, . . . a nonprofit corporation's action is authorized when: 1) the action is not prohibited by the N[P]CL or the corporation's articles [or bylaws]; and 2) the action is not clearly unrelated to the corporation's stated purpose.

*Zampogna v. Law Enf't Health Benefits, Inc.*, 151 A.3d 1003, 1013 (Pa. 2016). With these principles in mind, we turn to the parties' arguments.[12]

---

[11] Specifically, Developers, in their Answer to the Association's Application to Quash, contend the following issues remain undecided in this case: (1) whether the Board had the authority to enact the 2,500 Square Foot Rule; (2) whether the actions of the Board reflected personal animus against M4 Holdings; and (3) whether Developers purchased 713 and 714 Skye Drive in reliance upon resale certifications "which did not reflect" the 2,500 Square Foot Rule had been adopted. (Answer ¶ 1.)

[12] Our "standard of review in a declaratory judgment action determines whether the trial court committed a clear abuse of discretion or an error of law. In a case where the issues are questions of law, the standard of review is *de novo*. The scope of review is plenary." *City of Philadelphia v. Zampogna*, 177 A.3d 1027, 1034 (Pa. Cmwlth. 2017) (citations omitted).

A. **Whether the series of email correspondence among the members of the Board on April 10 and 11, 2013, constituted a meeting of the Board.**

*(1) Parties' Arguments*

The Association submits that the series of email correspondence exchanged between the members of the Board on April 10 and 11, 2013, constituted a meeting of that body, and common pleas erred by concluding otherwise. The Association cites to Section IV, Article XX, Paragraph 1 of its Bylaws in support of its position that the Board may conduct meetings via email. The Association acknowledges that Section IV, Article XX, Paragraph 1 of its Bylaws deviates from the standard set forth in Section 5708 of the NPCL, but concludes, as common pleas did, that the deviations are permitted by the prefatory language of Section 5708. Upon "a fair review of the e[]mail exchange," Association contends, "it [is] clear that a majority of the Board members did vote in favor of adopting the [2,500] Square Foot Rule." (Association's Brief (Br.) at 24.) Accordingly, the Association suggests this Court "should consider the Board . . . to have properly followed the authority granted to the Board under the Bylaws to conduct a meeting electronically and vote upon the [2,500] Square Foot Rule through the same online communication." (*Id.* at 29.)

The Association takes issue with common pleas' imposition of five safeguards the board of directors of a not-for-profit corporation must fulfill in order to conduct a meeting via email, including "*inter alia*, the need for 'simultaneous continuous presence and assembly sufficient to maintain a quorum throughout the [e]mail [c]ommunication [s]tring.'" (*Id.* at 17 (quoting Memorandum Op. at 16).) The five safeguards common pleas outlined in its Memorandum Opinion, the Association contends, are not contained in the plain language of the NPCL or the Bylaws. As such, the Association argues, common pleas "improperly interfered with and contravened the Board's express rule-making authority" and "substitut[ed] its

15

opinion for that of our Legislature" by imposing requirements not in the Bylaws or the NPCL. (*Id.* at 19, 23.) Noting that the Legislature amended the NPCL in July 2013, the Association essentially argues that if the Legislature had intended for there to be the safeguards common pleas described in its opinion, the Legislature could have added those safeguards when it amended the NPCL. (*Id.* at 21.)

Notwithstanding its argument that common pleas contravened the NPCL and the Bylaws, the Association takes the position that the additional requirements set forth by common pleas in its Memorandum Opinion were met in this case. The Association contends Gould formally initiated a "meeting" of the Board via his 12:29 p.m. email on April 10, 2013, and that "[a]ll of the Board members participated in the exchange of e[]mails." (*Id.* at 24.) "[T]here is no evidence in the record[,]" the Association asserts, "to suggest that the e[]mail exchange among the Board members failed to provide the Board members with a full and fair opportunity to be heard or to participate in a meaningful manner." (*Id.*) As to corporate formalities, the Association argues "[a]s can be seen" from the record "the e[]mail thread effectively serves as a transcript of the meeting itself, and in many ways, is even more accurate than a mere summary of the Board's discussions typically found in meeting minutes." (*Id.* at 26.)

The Association acknowledges that this case presents an issue of first impression, whether boards of directors of not-for-profit corporations may conduct meetings via email, but points out that courts in other jurisdictions have concluded that "e[]mail messages in which a majority of board members participated constituted a meeting" and that legislatures in other states "have also begun to authorize meetings via e[]mail, and in some instances voting by e[]mail." (*Id.* at 21-22.)

16

Developers respond by asserting that "[u]nder the Association's argument, they [we]re having one continual meeting" on April 10 and 11, 2013 and that the NPCL "does not allow a meeting to exist perpetually by emails." (Developers' Br. at 14-15.) Developers, noting that Section 5708 of the NPCL provides that members of a board must be able to hear each other during meetings, argue that since emails do not allow "persons participating in [a] meeting [to] hear each other," a board may not conduct meetings via email under the NPCL. (*Id.*) Developers also take issue with the fact that there was no notice to the members of the Board of the purported April 10 and 11, 2013 meeting. Accordingly, Developers conclude the series of email correspondence exchanged between the members of the Board on April 10 and 11, 2013, did not constitute a meeting of the Board.

In its reply brief, the Association essentially argues that Developers' reliance on the NPCL is misplaced because "there is no requirement under the [] Bylaws for the members of the Board . . . to 'hear' each other incident to conducting a meeting online." (Association's Reply Br. at 2-3.) The Association contends that its Bylaws require a meeting held via "online communication equipment must enable all Board members to 'participate in the meeting.'" (*Id.* at 3.) The Association maintains that the record is clear that all of the members of the Board participated in the purported meeting on April 10 and 11, 2013, and adopted the 2,500 Square Foot Rule by a majority vote.

### (2) Analysis

To determine whether the series of email correspondence exchanged between the members of the Board on April 10 and 11, 2013, constitutes a meeting of the Board, we must examine the applicable provisions of the NPCL and the Bylaws to see whether those provisions permit the Board to conduct meetings via email. In

17

examining the applicable provisions, we are guided, as we always are, by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501-1991. When we interpret corporate bylaws, we "must use the same rules applicable to the interpretation of statutes." *In re Nonprofit Corp. Trs. to Compel Inspections of Corp. Info.*, 157 A.3d 994, 1001 (Pa. Cmwlth. 2017) (quoting *Purcell v. Milton Hershey Sch. Alumni Ass'n*, 884 A.2d 372, 379 n.10 (Pa. Cmwlth. 2005)). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the [drafter]." Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). "[T]he best indication of legislative intent is the plain language of a statute." *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003). As such, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). "A statute is ambiguous when there are at least two reasonable interpretations of the text." *A.S. v. Pa. State Police*, 143 A.3d 896, 905-906 (Pa. 2016). When interpreting statutes, "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage." Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a).

Section 5703(a) of the NPCL provides that "[m]eetings of the board of directors . . . may be held at such place within or without this Commonwealth as the board of directors . . . may from time to time appoint or as may be designated in the notice of the meeting." 15 Pa.C.S. § 5703(a). Section IV, Article VII, Paragraph 5 of the Bylaws similarly provides that "Board meetings may be held at such times and in such places as a majority of the directors determines." (Bylaws, Section IV,

18

Article VII, ¶ 5, R.R. at 1243a.)  At the time of the email exchange, Section 5708 of the NPCL provided that:

> **[e]xcept as otherwise provided in the bylaws**, one or more persons may participate in a meeting of . . . the board of directors . . . by means of **conference telephone or similar communications** equipment by means of which all persons participating in the meeting **can hear** each other.  Participation in a meeting pursuant to this section shall constitute presence in person at the meeting.

*Former* 15 Pa.C.S. § 5708 (emphasis added).[13]

By its terms, Section 5708 of the NPCL controls "[e]xcept as otherwise provided in the bylaws."  *Id.*  Section IV, Article XX, Paragraph 1 of the Bylaws provides that:

> One or more directors may participate in a meeting of the Board of Directors via **conference telephone** or **similar** on-line communications equipment or other technology that enables all Board members to participate in the meeting.  Participation in a meeting pursuant to this section constitutes presence in person for quorum and voting purposes.

(Bylaws, Section IV, Article XX, ¶ 1, R.R. at 1251a (emphasis added).)  Under both Section 5708 of the NPCL and Section IV, Article XX, Paragraph 1 of the Bylaws,

---

[13] Section 5708 of the NPCL was amended in July 2013, with an effective date of September 9, 2013, as follows:

> Except as otherwise provided in the bylaws, one or more persons may participate in a meeting of . . . the board of directors or an other body of a nonprofit corporation by means of conference telephone or other electronic technology by means of which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this section shall constitute presence in person at the meeting.

15 Pa.C.S. § 5708(a).  As the actions at issue here occurred before this amendment, we focus on the former version of Section 5708.

participation by means provided for in those provisions constitutes presence in person.

What is notably different from the NPCL and the Bylaws is that Section IV, Article XX, Paragraph 1 of the Bylaws does **not** contain the phrase that "all persons participating in [a] meeting can hear each other," as does Section 5708. However, while the Bylaws do not specifically use the phrase "can hear each other," this provision of the Bylaws does provide that the "on-line communications equipment or other technology" used to participate in a meeting be "**similar**" to a **"conference telephone."** (Bylaws, Section IV, Article XX, ¶ 1 (emphasis added).) Although at first glance there could be a question as to whether "similar" applies only to "on-line communications equipment" or whether it also applies to "other technology," if the drafters of the Bylaws intended to allow members to participate in meetings via **any** technological communications equipment, there would be no need to include the phrase "conference telephone or similar on-line communications," which would be surplusage. Pursuant to the rules of statutory construction, "[t]he courts must construe every statute, if possible, to give effect to all of its provisions so that none are rendered mere surplusage." *White v. Assocs. In Counseling & Child Guidance, Inc.*, 767 A.2d 638, 642 (Pa. Cmwlth. 2001) (citing Sections 1921(a) and 1922(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1921(a), 1922(a)). Therefore, giving effect to the entire provision, Section IV, Article XX, Paragraph 1 of the Bylaws provides that Board members may participate in a meeting using on-line communications or other technology that is similar to a conference telephone. Thus, the question becomes whether the series of email correspondence at issue here constitutes "on-line communications equipment or other technology" that is "similar" to a conference telephone. (Bylaws, Section IV, Article XX, ¶ 1.)

20

Neither the Bylaws nor the NPCL define the terms "conference telephone" or "meeting"; therefore, we look to their common usage. 1 Pa.C.S. § 1903(a). Black's Law Dictionary defines "teleconference" as "[a] meeting in which some or all of the participants are not physically present but take part by electronic communications such as telephone, closed-circuit television, Internet text, audio, or other audiovisual means." *Teleconference*, Black's Law Dictionary (11th ed. 2019). "[M]eeting" is defined as "an act or process of coming together: such as . . . an assembly for a common purpose." *Meeting*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/meeting (last visited July 23, 2020). "Assembly," in turn, is defined as "a company of persons gathered for deliberation and legislation, worship, or entertainment." *Assembly*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/assembly (last visited July 23, 2020). Thus, when using a "conference telephone" to participate in a "meeting," the gathered members are interacting in real time. Common pleas described this interaction as "simultaneous[,] continuous presence." (Memorandum Op. at 15-16.) There are many online technologies and communications equipment such as cell phones, voice over internet protocol, also known as IP telephony, and more recently FaceTime, What's App, Zoom, etc. that permit such simultaneous contemporaneous communication. However, the series of email correspondence at issue in this case is not similar to the simultaneous contemporaneous communication that would occur with the use of a conference telephone because the Board members were not interacting with each other in real time on April 10 and 11, 2013.

The record reflects that while in some instances emails were sent in relatively close proximity to one another, in many instances the emails exchanged between members of the Board on April 10 and 11, 2013, were sent hours apart. For example,

21

the first email in the series of emails at issue was sent by Gould at 12:29 p.m. on April 10, 2013. (R.R. at 798a.) Roughly 3.5 hours later, at 4:02 p.m., Smiley sent the first reply to Gould's initiating email. (*Id.* at 797a-98a.) Additionally, the record also reflects that Gould sent an email at 2:45 a.m. on the morning of April 11, 2013, and the next email was not sent until five hours later, after 7:00 a.m. the same day. (*Id.* at 1283a.) The gaps in time between the series of email correspondence demonstrate that the members of the Board were not simultaneously communicating with each other like they would be through the use of a conference telephone.

Furthermore, striking to this Court is the absence of a single email chain/thread that can be read from start to finish. The Association contends that "the e[]mail thread" created by the series of email correspondence at issue "effectively serves as a transcript of the meeting itself, and in many ways, is even more accurate than a mere summary of the Board's discussions typically found in meeting minutes." (Association's Br. at 26.) However, it is misleading to refer to these series of email exchanges as "a thread," which would allow the members of the Board to read all the responses of the other members from start to finish, as the record discloses there are multiple "threads" which contain various exchanges. The multiple threads contained in the reproduced record do not include the response the Association alleges Scholtz sent on April 11, 2013, reflecting that either those threads are not a complete reflection of all the emails exchanged between the Board members on April 10 and 11, 2013, or that Scholtz's alleged response is not a part of those threads. Unlike a chat, internet text, or instant messaging program where one is able to read a single transcript of the exchange, here, there is not a single uniform thread amongst the members of the Board that would allow one to read the series of email correspondence from start to finish. Rather, the reader of the emails

22

must painstakingly piece together various emails in order to discern the discussion. The Association's argument that Scholtz did in fact send a reply email, contrary to common pleas' finding that Scholtz did not participate, highlights just how difficult it is to piece together the various email threads to review all of the emails that allegedly comprise the purported meeting. This underscores our conclusion that the emails are not similar to a telephone conference as the email responses did not flow similar to discussions held via conference telephone.

Although courts of this Commonwealth have not had occasion to yet determine whether meetings could be conducted via a series of email exchanges, other jurisdictions have examined similar issues, albeit in a different context. For instance, in *Beck v. Shelton*, 593 S.E.2d 195 (Va. 2004),[14] the Supreme Court of Virginia considered whether emails exchanged between members of a public body constituted a "meeting" under Virginia's Freedom of Information Act (FOIA). Virginia's FOIA defines "meeting," in relevant part, as "including work sessions, when sitting physically, or through telephonic or video equipment . . . as a body or entity, or as an informal assemblage . . . ." *Id.* at 200 (quoting Section 2.2-3701 of Virginia's FOIA, Va. Code § 2.2-3701). The court further examined the common use definition of the word "assemble," noting it "means 'to bring together' and comes from the Latin *simul*, meaning 'together at the same time.'" *Id.* (quoting Webster's Third New Int'l Dictionary 131 (1993)). The court determined:

> The term inherently entails the quality of simultaneity. While such simultaneity may be present when e[]mail technology is used in a "chat

---

[14] "When confronted with a question heretofore unaddressed by the courts of this Commonwealth[,] we may turn to the [decisions of] courts of other jurisdictions. Although we are not bound by those decisions, we may use decisions from other jurisdictions for guidance to the degree we find them useful and not incompatible with Pennsylvania law." *Commonwealth v. Manivannan*, 186 A.3d 472, 483-84 (Pa. Super. 2018) (quotations and citation omitted).

23

room" or as "instant messaging," it is **not present** when e[]mail is used as the functional equivalent of letter communication by ordinary mail, courier, or facsimile transmission.

*Id.* at 199 (emphasis added). The court stated:

Indisputably, the use of computers for textual communication has become commonplace around the world. It can involve communication that is functionally similar to a letter sent by ordinary mail, courier, or facsimile transmission. In this respect, there may be significant delay before the communication is received and additional delay in response. However, computers can be utilized to exchange text in the nature of a discussion, potentially involving multiple participants, in what are euphemistically called "chat rooms" or by "instant messaging." In these forms, computer generated communication is virtually simultaneous.

In the case before us, the e[]mail communications did not involve virtually simultaneous interaction. Rather, the e[]mail communications at issue in this case were more like traditional letters sent by ordinary mail, courier, or facsimile . . . . The shortest interval between sending a particular e[]mail and receiving a response was more than four hours. The longest interval was well over two days.

*Id.* at 198-99. Thus, the court concluded the emails at issue **did not** constitute a meeting.

Here, as stated above, the email correspondence exchanged between the members of the Board on April 10 and 11, 2013, were often sent hours apart and cannot be read from start to finish without trying to piece the discussion together. Like in *Beck*, the emails were sent over a span of nearly two days, and are more akin to ordinary mail, courier, or facsimile as they did not "involve virtually simultaneous interaction" or entail a "quality of simultaneity." *Beck*, 593 S.E.2d at 198-199. Simply put, the email correspondence at issue in this case does not reflect a simultaneous or contemporaneous communication between the members of the Board on April 10 and 11, 2013 and, therefore, the email correspondence does not

24

constitute a meeting of the Board under Section IV, Article XX, Paragraph 1 of the Bylaws. While the Association points to authority from other jurisdictions for the proposition that meetings via email are permitted, those cases are distinguishable. In *Harlan v. Frawley Ranches PUD Homeowners Association, Inc.*, 901 N.W.2d 747 (S.D. 2017), the issue was not whether the emails constituted a meeting, but whether they were valid votes. The court expressly found that there was nothing in the association's bylaws that required an election to amend a declaration of covenants to occur at a meeting. *Id.* at 751. Here, no one contends a meeting was not required to enact the 2,500 Square Foot Rule. The issue is squarely whether the series of email correspondence between the members of the Board on April 10 and 11, 2013 was, in fact, **a meeting**. In addition, in contrast to *Harlan*, the Bylaws here are not silent on how a member can participate in a meeting. The Bylaws provide a mechanism for participation "via conference telephone or **similar** on-line communications equipment or other technology that enables all Board members to participate in the meeting." (Bylaws, Section IV, Article XX, ¶ 1 (emphasis added).) As discussed, the emails here are not a "similar" form of communication as a conference telephone.

The second case that the Association cites, *Wood v. Battle Ground School District*, 27 P.3d 1208 (Wash. Ct. App. 2001), is likewise distinguishable. There, the court examined whether email exchanges constituted a meeting under the state's open public meetings law. The court began by noting that "meetings" under that law was broadly defined as "meetings at which action is taken" and that "[e]lected officials no longer conduct the public's business solely at in-person meetings." *Id.* at 1216. Given the broad definition and the liberal construction of the state's open meetings law, the court concluded that an "exchange of e[]mails can constitute a

'meeting.'" *Id.* at 1217. Here, as discussed, the Bylaws are not nearly as broad. Nor is the public policy of promoting open meetings present in this case. Therefore, *Harlan* and *Wood* are distinguishable from the present matter and do not support the proposition that the series of email correspondence at issue constituted a meeting of the Board.

Additionally, we are troubled, as was common pleas, by the Board's lack of observance of formal corporate formalities. The action that the Association claims occurred during the series of email correspondence at issue in this case was significant. The Association claims that an amendment to the Bylaws of the Association was passed, altering the real property rights of all the property owners in the Association. It is important that such an action be taken pursuant to the requirements of the Bylaws, which assure that the members of the Board appreciate that they are taking formal action. That did not occur here.

As discussed above, the emails are disjointed and hard to follow as there is no single thread but many separate threads. In the absence of a single thread that can be read from start to finish, it is unclear whether the members of the Board understood they were participating in a formal meeting,[15] whether they were actually voting on a proposal or supporting future proposed action, and, if they were taking official action, whether they were voting on a proposal to change the Bylaws or to exercise their ROFR on 713 and 714 Skye Drive.

---

[15] Section IV, Article VII, Paragraph 6 of the Bylaws provides that "[w]ritten or oral notice of every meeting of the Board . . . will be given to each director." (Bylaws, Section IV, Article VII, ¶ 6, R.R. at 1243a.) The record here is devoid of any evidence that the members of the Board were given any notice of the purported meeting at issue here until Gould initiated the purported meeting by email on April 10, 2013. Ordinarily members of a board of directors may waive the notice requirement. *See former* Section 5705 of the NPCL, 15 Pa.C.S. § 5705. There is no evidence in the record that the Board members attempted to waive notice of the purported meeting.

It is clear from a review of the record that discussion of the ROFR issue was conflated with discussion of the 2,500 Square Foot Rule, blurring the matter purportedly being voted upon. While the subject line of the series of email correspondence at issue is "Re: R[OF]R," the discussion in the series of emails was not limited to the Board's ROFR. (R.R. at 798a.) In some of the emails, Board members indicated support for the Board exercising its ROFR while in other emails Board members indicated support for adopting the 2,500 Square Foot Rule. (*Compare* Conaway's April 11, 2013, 7:09 a.m. email, R.R. at 796a, *with* Ferretti's April 11, 2013, 7:38 a.m. email, R.R. at 796a.) The conflation of these two issues coupled with the fact that multiple email threads were ongoing at the same time, which makes it hard to understand what each member was responding to, casts doubt as to whether each member of the Board understood precisely the action purportedly being taken. This is compounded by the lack of a formal vote. Many of the members stated in their emails that they "supported" adopting the 2,500 Square Foot Rule; however, it is unclear whether this "support" constituted an affirmative vote or merely indicated future support for taking a course of action. While a vote may not necessarily have to be in the form of yea or nay, conflating a purported vote with discussion of an issue makes it unclear whether the members of the Board were actually attempting to vote on the 2,500 Square Foot Rule or simply indicating future support.

In summary, for the reasons set forth above, the series of email correspondence at issue here is not "similar" to communication conducted via a "conference telephone" and, therefore, the series of email correspondence exchanged between the members of the Board on April 10 and 11, 2013, did not constitute a meeting of the Board as defined in the Bylaws. Since the series of email

27

correspondence exchanged between the members of the Board on April 10 and 11, 2013, did not constitute a meeting of the Board, any action purportedly taken during the email correspondence does not constitute a validly adopted action of the Board.

B.     Whether the Board later ratified the 2,500 Square Foot Rule.

*(1)Parties' Arguments*

The Association argues that even if the 2,500 Square Foot Rule was not validly adopted through the email exchange on April 10 and 11, 2013, the Board later ratified this rule by its "course of action." (Association's Br. at 35.) The Association concedes that the 2,500 Square Foot Rule was not ratified by a formal vote or by written approval as required by the NPCL and the Bylaws. (*Id.* at 34.) However, citing *KoEune v. State Bank of Schuylkill Haven*, 4 A.2d 234 (Pa. Super. 1939), the Association argues that "proof of ratification need not be confined to formal acts of the board of directors as shown by the minutes of meetings. It may be established from actions or passive acquiescence of the directors if they had full knowledge of the facts." (Association's Br. at 35-36.) The Association contends the Board ratified the 2,500 Square Foot Rule by its passive conduct. Specifically, the Association cites to the fact that: (1) the 2,500 Square Foot Rule was discussed at a meeting of the Board on May 4, 2013, without objection; (2) a notice was issued to all the members of the Association that the Board approved the 2,500 Square Foot Rule; and (3) the 2,500 Square Foot Rule was posted on the Association's website and added to the Bylaws.

Developers did not respond to the Association's arguments regarding ratification. However, for the reasons stated in the foregoing sections, Developers contend the 2,500 Square Foot Rule was not validly adopted by the Board.

28

*(2)Analysis*

The Association did not raise the issue of ratification by conduct before common pleas and, therefore, cannot now raise this issue "for the first time on appeal." Pennsylvania Rule of Appellate Procedure 302(a), Pa.R.A.P. 302(a). Even if this issue was not waived, the Association has not demonstrated that ratification by conduct, without formal action, is a permitted form of ratification under the NPCL and/or the Bylaws. Section IV, Article VII, Paragraph 7 of the Bylaws provides that "[a]ny action that normally would be taken at a meeting of the [Board] may be taken without a meeting if a majority of directors confirms, in writing, agreement with the action taken." (Bylaws, Section IV, Article VII, ¶ 7 (emphasis omitted), R.R. at 1243a.) The Association concedes the 2,500 Square Foot Rule was not ratified by written approval. (Association's Br. at 34.) Instead, the Association, citing *KoEune*, argues that it ratified the 2,500 Square Foot Rule by its conduct. The issue in *KoEune* was, among other things, whether the board of directors of a for-profit corporation ratified an alleged oral contract. In considering this issue, the Superior Court stated that "[p]roof of ratification need not be confined to formal acts of the board of directors as shown by the minutes of the meeting. It may be established from actions or from passive acquiescence of the directors if they had full knowledge of the facts relating" to the oral contract. 4 A.2d at 238. *KoEune* is distinguishable from the present matter as the corporation in *KoEune* was not a not-for-profit corporation; therefore, an entirely different statutory scheme would apply from the present case. Further, *KoEune*, concerns the ratification of a contract, not an amendment to a corporation's bylaws. Therefore, *KoEune* is distinguishable from the present matter and does not support the proposition that the board of directors of

29

a not-for-profit corporation may ratify an amendment to its bylaws by its conduct when that corporation's bylaws only provides for ratification by written approval.[16]

## IV.    Conclusion

It is not lost on the Court that in the midst of a global pandemic, which has required people to engage in physical distancing, we are holding that the series of email correspondence at issue in this case does not constitute a meeting of the Board. However, the series of email correspondence at issue in this case occurred in 2013, long before current events regarding the novel coronavirus (COVID-19) pandemic. Regardless, a not-for-profit's board of directors is only permitted to take action as authorized by the NPCL, the nonprofit's articles of incorporation, and its bylaws. *See Zampogna*, 151 A.3d at 1013.  Here, the Bylaws permit the Board to meet without physical presence; however, the Bylaws provide that the technology the Board employs to conduct its meeting must be "similar" to a conference telephone. For the foregoing reasons, the series of email correspondence at issue in this case are not similar to the simultaneous contemporaneous communications that would take place using a conference telephone and, therefore, the series of email correspondence does not constitute a meeting of the Board as defined by the Bylaws. Accordingly, the 2,500 Square Foot Rule was not validly adopted at a meeting of the Board as required by the Bylaws.  Further, as stated above, the Board did not later ratify the 2,500 Square Foot Rule.  Therefore, we affirm common pleas' Amended Order.  However, because the issue of damages in this matter was bifurcated, we

---

[16] In light of our conclusion that the 2,500 Square Foot Rule was not validly adopted or ratified by the Board, and in light of the concession of Developers' counsel at argument that if it prevails in this matter its cross appeal is moot, Developers' Notice of Cross Appeal and the Association's Application to Quash the Notice of Cross Appeal are dismissed as moot.

relinquish jurisdiction to common pleas for further proceedings regarding the issue of damages.

                                         _____

                                         **RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M4 Holdings, LLC, a New Jersey          :
limited liability company and           :
Boulderview Properties, LLC, a          :
Pennsylvania limited liability company  :
                                        :
            v.                          :   No. 902 C.D. 2019
                                        :
Lake Harmony Estates Property           :
Owners' Association, a Pennsylvania     :
non-profit corporation,                 :
                    Appellant           :


M4 Holdings, LLC, a New Jersey          :
limited liability company and           :
Ledgestone Properties, LLC, a           :
Pennsylvania limited liability company  :
                                        :
            v.                          :   No. 1197 C.D. 2019
                                        :
Lake Harmony Estates Property           :
Owners' Association, a Pennsylvania     :
non-profit corporation,                 :
                    Appellant           :


M4 Holdings, LLC, a New Jersey          :
limited liability company and           :
Boulderview Properties, LLC, a          :
Pennsylvania limited liability company  :
                                        :
            v.                          :   No. 1424 C.D. 2019
                                        :
Lake Harmony Estates Property           :
Owners' Association, a Pennsylvania     :
non-profit corporation                  :
                                        :
Appeal of:  M4 Holdings, LLC,           :
Boulderview Properties, LLC, and        :
Ledgestone Properties, LLC              :

# **O R D E R**

**NOW**, August 14, 2020, the Amended Order of the Court of Common Pleas of Carbon County (common pleas), dated June 24, 2019, is hereby **AFFIRMED**. Consistent with this Court's Opinion in this matter, the Notice of Cross Appeal filed by M4 Holdings, LLC, Boulderview Properties, LLC, and Ledgestone Properties, LLC, and the Application to Quash the Notice of Cross Appeal filed by Lake Harmony Estates Property Owners' Association are hereby **DISMISSED** as **MOOT**. Jurisdiction is hereby relinquished for common pleas to conduct further proceedings on the issue of damages.

_____
**RENÉE COHN JUBELIRER,** Judge